UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:06 CV-312-H

GREIF, INC.                                                                                                          PLAINTIFF

V.

MacDONALD, et al.                                                                                              DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

Plaintiff Greif, Inc. ("Greif"), a manufacturer of corrugated boxes, has sued former employees and their recently formed corporation, Independent II, LLC ("Independent II"), for misappropriation of trade secrets in violation of the Kentucky Uniform Trade Secret Act ("KUTSA"), Ky. Rev. Stat. Ann. §§ 365.880 - 900 (2006), breach of employment contract, unfair competition, tortious interference with contract, breach of fiduciary duty, and civil conspiracy. Defendants have counterclaimed and moved to dismiss Plaintiff's noncontractual claims as preempted by KUTSA.

Plaintiff has moved for a preliminary injunction to prevent Defendants from using certain information obtained during their employment with Greif to advance their new business. The current motion raises interesting questions about the circumstances under which employees may leave one company to start a competing business. On two separate days, the Court has heard extensive and superb arguments by both counsel. The Court finds sufficient evidence to issue only a limited preliminary injunction.

I.

In 1981, Defendant Neil MacDonald formed Independent Container, Inc. ("Independent"), which manufactured and sold corrugated boxes in Kentucky and surrounding areas. From its inception to its sale some sixteen years later, MacDonald remained the controlling shareholder, a director, and President of Independent. Beginning in 1982, he hired on behalf of Independent Defendants Craig MacDonald, Robbins, Wiegal, Rogers, Barnhouse, Lynch, and Walsh. In 1997, Neil MacDonald and all minority shareholders of Independent executed a Stock Purchase Agreement, through which Greif acquired all of the issued and outstanding shares of Independent. Later that year, Independent merged into Greif, and Greif assumed all rights, duties, and obligations of Independent.

In addition to the Stock Purchase Agreement, Greif and Neil MacDonald entered into two ancillary agreements: a Non-Competition Agreement and an Employment Agreement. Under the terms of the Non-Competition Agreement, Neil MacDonald agreed that, during his employment and for a period of three years after the termination of it, he would not, directly or indirectly, compete with Greif in the container board business. The Employment Agreement executed the same day states that MacDonald will not disclose or use any confidential business information or trade secrets of Greif except in the carrying out of his employment responsibilities for Greif. Neil MacDonald terminated his employment with Greif on May 9, 2002, the restrictive covenants of the Non-Competition Agreement terminated on May 10, 2005.

On July 15, 2005, Neil MacDonald filed the Articles of Organization for Independent II. Within a year Independent II began manufacturing or selling boxes in competition with Greif. Neil MacDonald is the sole manager and controlling member of Independent II, which has made

2

sales to customers of Greif and of Independent prior to its acquisition by Greif.

A handful of Greif employees have transferred to Independent II. Defendants Craig MacDonald, Robbins, Wiegel, Rogers, Lynch, and Walsh all accepted employment positions or acquired ownership interests in Independent II while still employed by Greif and did not notify Greif of their intention to transfer. These defendants had access to Greif's Commercial Excellence business system and Manufactured Item Profit Analysis Reports, which contain cost and profit margin information for each product produced by Greif. They also had access to lists of potential Greif customers, specification sheets ("spec sheets") for each product produced by Greif, and sales comparison reports, which show total sales, costs, and profit margins for products sold. Greif contends that Defendants' possession and use of such information constitutes misappropriation of trade secrets.

When deciding whether to issue a preliminary injunction, the Court considers the following four factors: (1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). These factors are to be balanced against one another and are not prerequisites to the grant of a preliminary injunction. *Id.* The Court finds that Plaintiffs meets these requirements.

II.

The Court must determine first whether Greif has a strong likelihood of success on the merits for each of its claims. *See id.* Count One of the complaint is for misappropriation of trade

3

secrets in violation of KUTSA. To prevail under KUTSA, Plaintiffs must show both misappropriation and that the misappropriated information qualifies as a trade secret. *Auto Channel, Inc., et al. v. Speedvision Network, LLC, et al.*, 144 F.Supp.2d 784, 794 (W.D. Ky. 2001). KUTSA defines a trade secret as:

> Information... that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ky. Rev. Stat. Ann. § 365.880(4). Because Kentucky adopted KUTSA with only minor changes to the uniform law, decisions in other jurisdictions provide guidance for its application and construction. *Auto Channel, Inc.*, 144 F.Supp.2d at 788.

Defendants had access to a great deal of confidential information during their employment with Greif. However, it is not clear whether any of that information actually meets the definition of "trade secrets" under KUTSA or that Defendants actually misappropriated it. The most likely category of trade secrets is certain "financial information" or "pricing information." This information includes profit margins on each item that Greif sells. This information could be highly valuable to the salespersons of a fledgling company, and if it does in fact constitute trade secrets the use of such confidential information by a competitor could be potentially very damaging to Greif. Other courts have recognized the value of pricing and profit margin information and have labeled it a trade secret. *See Anderson Chem. Co., Inc. v. Green*, 66 S.W.2d 434, 442 (Tex. App. 2001). However, to prevail on this claim, Greif will need to show that it closely guarded such information and treated it as a trade secret. So far Greif has shown no formal process for identifying confidential information. The preliminary evidence

seems at best mixed as to the actual confidentiality of the information. Greif posted some of the profitability reports on bulletin boards throughout the plant when they were visible by every employee and guest. Greif regularly provided such information to every employee so they could verify their commissions. Moreover, profitability comparisons for Greif would be less relevant to Independent II, which likely has an entirely different cost structure than Greif. Salesmen, who would have been acutely aware of relative product profitability, cannot be expected to simply forget such information when they transfer employment.

Likewise, Plaintiffs have not demonstrated a strong likelihood that the spec sheets or drawings contained therein are trade secrets. Although Independent II could save considerable time and effort by using Greif's spec sheet drawings rather than creating their own, it appears that Plaintiff failed to sufficiently conceal them. Some evidence has been introduced that clients requested and often received spec sheets for their files, which would suggest that the drawings were not secret at all. Clients also own the cutting dies, which are created by Greif using the spec sheets and from which all dimensions found in the drawings could be ascertained. Additionally, Independent II uses the same "Imaginera" software to design its boxes as Greif, and much of the design information is provided by clients.

The potential customer lists are even less likely to be trade secrets since they were compiled from public databases that can be acquired with relative ease. Plaintiff has not shown that it took any of the sorts of measures needed to demonstrate deep concern for the confidentiality of these customer lists. *See ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 714 (6th Cir. 2005).

As this analysis demonstrates, Plaintiff will have some considerable difficulty

5

establishing even the first element of its KUTSA claim, not to mention demonstrating that such information was misappropriated. Defendants have submitted numerous affidavits that directly and specifically challenge the central elements of Plaintiff's case. Under these circumstances, injunctive relief is inappropriate on the KUTSA claim.

### III.

Count two of the complaint is for breach of contract by MacDonald. In his employment agreement, MacDonald acknowledged that the business of Greif was competitive and its confidential information was valuable. The agreement further states that MacDonald "will not, at any time during or after his or her employment by [Greif], make any unauthorized disclosure of any confidential business information or trade secrets of [Greif] or its affiliates, or make any use thereof, except in the carrying out of his or her employment responsibilities hereunder." Confidential business information or trade secrets of Greif are defined as "strategies, methods, books, records, and documents, [its] technical information concerning [its] products, equipment, services, and processes, procurement procedures and pricing techniques, the names of and other information (such as credit and financial data) concerning [its] customers and business affiliates..."

The plain language of the Employment Agreement precludes Neil MacDonald from using any confidential business information outside of his employment with Greif. In isolation, this clause appears to weigh heavily in Plaintiff's favor. On the other hand, the Employment Agreement was executed on May 9, 1997, the same day as a Noncompetition Agreement, which complicates the situation. Since the Noncompetition Agreement expired May 10, 2005, this Court will need to determine whether the Employment Agreement's restrictive covenants were

intended to be much broader than those of the Noncompetition Agreement and will apply in perpetuity. Much more evidence and argument are necessary on this point, and the Court will address it at a later stage of litigation.

The remaining claims for breach of employment contract, unfair competition, tortious interference with contract, breach of fiduciary duty, and civil conspiracy are all based at least in part on allegations of misappropriations of trade secrets, which appear to form the crux of Plaintiff's complaint. As such, each of these remaining claims may be partly or wholly preempted by KUTSA, so it is difficult to say that there is a strong likelihood of success on any of them. The Court will make a definitive ruling on Defendant's motion to dismiss those claims on the basis of KUTSA preemption in a subsequent memorandum opinion and order.

IV.

The remaining three factors of the preliminary injunction test weigh in favor of granting only a very limited injunction to protect Plaintiff's potential trade secrets. Irreparable harm could occur if Defendants are permitted to continue to use Greif's confidential financial and pricing information to syphon business away from it. Relatively little harm will be inflicted upon Defendants if the injunction is crafted narrowly to simply instruct them to return potential trade secret information to Greif.

To preclude Defendants from competing with Greif or continuing to serve their current customers or solicit new customers is far too expensive a remedy based on the evidence thus far. Such a remedy might unnecessarily and unfairly tie the hands of Independent II in the marketplace where Plaintiff has yet to show a likelihood of success on the merits of its claims. This is a complicated case. While all the facts are yet to be organized, it is far from clear that

Greif will prevail. If they should do so, money damages would appear to be the appropriate remedy.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants shall be preliminarily enjoined from using any of Greif's written confidential business information concerning financial and pricing information, absent express consent from Greif. In other words, Independent II must return to Greif any written reports from its Commercial Excellence business system, Manufactured Item Profit Analysis Reports, or any other documents containing Greif's price and profit information. In all other respects, the motion for injunctive relief is DENIED.

IT IS FURTHER ORDERED that the parties shall meet and file an agreed discovery schedule and litigation plan.

cc: Counsel of Record